USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/24/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
-------------------------------------------------------- X
   UNITED STATES OF AMERICA,                             :
                                                         :            88-CR-325 (VEC)
              -against-                                  :
                                                         :         OPINION AND ORDER
   NELSON VARGAS,                                        :
                                                         :
                                     Defendant.          :
-------------------------------------------------------- X
```

VALERIE CAPRONI, United States District Judge:

Defendant Nelson Vargas, at 55 years old and having spent the past 32 years of his life incarcerated for his participation in a narcotics conspiracy, moves for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A). In support of his motion, Mr. Vargas points to: (1) his draconian sentence, the product of an outdated and unconstitutional sentencing scheme; (2) his health, age, and the increased risk he faces from each due to the ongoing COVID-19 pandemic; (3) his desire to care for his ailing, elderly mother; and (4) his complete rehabilitation. While perhaps no single factor alone would be sufficient to justify his release, Mr. Vargas contends that, in combination, these circumstances rise to the level of extraordinary and compelling reasons warranting compassionate release. The Government opposes Mr. Vargas's motion arguing primarily that Mr. Vargas's averments do not fit within the acceptable categories determined by the Bureau of Prisons ("BOP") as warranting early release. The Government does not appear to contest that Mr. Vargas, after spending over three decades in prison, has been rehabilitated, nor does the Government suggest that Mr. Vargas's release would pose any danger to the community.

Set to be released in June 2023, Mr. Vargas has served over 90% of his sentence, accounting for good-time credits. He has already served a sentence considerably longer than any

defendant in similar circumstances today would likely receive in this district.  Despite failing to

break from his criminal past for essentially the first decade of his sentence, Mr. Vargas has

turned himself into a model inmate.  By all accounts, he has dedicated himself to making a

positive impact upon his reentry to society; now, Mr. Vargas will receive the opportunity to do

so.  In considering the bases animating Mr. Vargas's request for compassionate release as well as

the factors set forth in 18 U.S.C. § 3553(a), the Court believes that a reduction of Mr. Vargas's

sentence is warranted.  Thus, Mr. Vargas's motion for compassionate release is GRANTED.

## BACKGROUND

On May 12, 1988, Mr. Vargas was arrested just days after his twenty-third birthday.  *See*

Presentence Report ("PSR") at 1.  On December 20, 1989, a jury convicted Mr. Vargas of

conspiring to distribute heroin in violation of 21 U.S.C. § 841.  *See id.* ¶¶ 1, 5.  Mr. Vargas was

one of five defendants charged and convicted for their roles in this conspiracy.  *Id.* ¶¶ 1–5.

While one of Mr. Vargas's codefendants appears to have spearheaded the negotiations and

transactions, all five defendants were alleged to have been part of the Poison Gang, a heroin-

dealing group based in lower Manhattan, and the Government contended that all defendants were

"equally culpable."  *Id.* ¶¶ 8, 12, 14.  The quantity of heroin in the case (approximately 8

kilograms) subjected Vargas to a mandatory minimum term of incarceration of 10 years.  *Id.* ¶

19.  At sentencing, the late Hon. David Edelstein accepted the Government's contention

regarding Mr. Vargas's culpability, citing facts at trial demonstrating that Mr. Vargas personally

delivered money to undercover agents and was present in a car with one or more codefendants in

anticipation of receiving 12 units of high quality Chinese heroin from the undercover agents.  *See*

Statement of Reasons ("SOR"), Dkt. 142-1.

At the time of his arrest, Mr. Vargas was no stranger to the criminal justice system; despite having just barely reached the age of 23, Mr. Vargas could be characterized as having lived a life of crime. In 1982, at the age of 17, Mr. Vargas was arrested for Criminal Sale of a Controlled Substance in the Third Degree. *See* PSR ¶¶ 28–29. Less than one year later, after having been released on his own recognizance, Mr. Vargas was arrested for Criminal Possession of a Narcotic in the Fourth Degree. *See id.* ¶¶ 31–32. Finally, in December 1983, then 18 years old, Mr. Vargas was arrested for Manslaughter in the First Degree; according to the PSR, Mr. Vargas stabbed another low-level drug dealer as a form of punishment for having tarnished the reputation of the Poison Gang. *See id.* ¶¶ 34–36. Between March and June 1984, Mr. Vargas was convicted of and sentenced on each offense, and he was incarcerated until April 28, 1988. *See id.* ¶¶ 28, 31, 34, 37. Only two weeks after having been released on parole, Mr. Vargas was arrested as part of the instant narcotics conspiracy. *Id.* ¶ 37.

In light of these prior convictions, the Probation Department determined that Mr. Vargas was a career offender under § 4B1.1 of the Sentencing Guidelines. *See* PSR ¶¶ 41–43. At sentencing, Judge Edelstein agreed, rejecting both of Mr. Vargas's objections to his characterization as a career offender. *See* SOR. The classification of Mr. Vargas as a career offender increased his base offense level from 34 to 37 and increased his criminal history category from V to VI. PSR ¶ 45. The net effect of the career offender adjustments was to increase his guideline range from 235–293 months to 360 months to life imprisonment. *Id.* Judge Edelstein imposed a sentence within the mandatory Guidelines range and sentenced Mr. Vargas to 480 months, or 40 years. *See* Judgment, Dkt. 142-1.

In the ensuing years, Mr. Vargas made multiple unsuccessful attempts to challenge his conviction and sentence, including a direct appeal and two habeas petitions to vacate his

sentence pursuant to § 2255. *See United States v. Vargas*, 969 F.2d 1041 (2d Cir. 1992) (unpublished table decision); *Vargas v. United States*, No. 01-CV-5527-VM (S.D.N.Y. June 28, 2002); *Vargas v. United States*, No. 09-CV-3466-LBS (S.D.N.Y. May 29, 2009).[1]

      Facing 40 years' imprisonment, Mr. Vargas began his term of incarceration making little break from his criminal past. Between 1993 and 2004, Mr. Vargas accrued 15 disciplinary infractions, ranging from refusing to obey an order, to possessing and testing positive for narcotics, to serious assault. *See* Disc. Record at 2–6, Dkt. 144-1. In the ensuing 16 years, however, Mr. Vargas has largely steered clear of disciplinary issues. Mr. Vargas incurred two minor infractions in 2011 for failing to submit to a drug test within the time limit and possession of an unauthorized item, and he committed an additional minor infraction in 2015 for disruptive conduct that Mr. Vargas claimed was the product of a misunderstanding. *See id.* at 1–2. Mr. Vargas has not been disciplined in over five years. Throughout his period of incarceration, Mr. Vargas has availed himself of many educational opportunities, earning his GED in 1992 and thereafter completing nearly 30 courses, including practical coursework such as Dental Lab Vocational Training and Aids and Disease Prevention. *See* Educ. Record, Dkt. 142-3. According to those responsible for his rehabilitation, notably his Correctional Counselor, gone is the drug-abusing, violent inmate of Mr. Vargas's youth. As of today, Mr. Vargas is assessed to be a man of "above average respect" for others and is "known as a very religious and God-Fearing man, who has taken every available educational, and self-improvement program" at USP Atlanta. Dkt. 142-2.

---

[1]      The Second Circuit recently granted Mr. Vargas leave to file a successive 2255 petition, in which he relies on *Johnson v. United States*, 135 S. Ct. 2551 (2015), to argue against his classification as a career offender pursuant to the residual clause of the Sentencing Guidelines. *See Vargas v. United States*, No. 16-2112 (2d Cir. May 8, 2017). In the wake of the Circuit's decision in *Nunez v. United States*, 954 F.3d 465 (2d Cir. 2020), however, it is unclear whether Vargas's currently pending motion is likely to succeed.

On April 16, 2020, Mr. Vargas wrote to BOP requesting home confinement or compassionate release. *See* Dkt. 142-4.  Having received no response from BOP, on June 18, 2020, Mr. Vargas's attorney submitted a renewed request to the warden of USP Atlanta. *See* Dkt. 142-5.  By letter dated July 23, 2020, BOP denied Mr. Vargas's request, noting that his bases for requesting compassionate release did not fit within the permissible categories. *See* Dkt. 142-6.  Having exhausted his administrative remedies, on August 20, 2020, Mr. Vargas moved this Court for compassionate release under § 3582(c)(1)(A). *See* Def. Mot., Dkt. 142.

In opposing Mr. Vargas's motion, the Government relied almost entirely on the argument that Mr. Vargas's "bases for compassionate release other than rehabilitation are legally not cognizable," as they did not fall within the defined categories set out in the Sentencing Commission's relevant policy statements. *See* Gov't Resp. at 4, 7, Dkt. 144.  Of the justifications urged by Mr. Vargas, the Government opposed on the merits only the assertions concerning his health. *See id.* at 5–6.  After the Government had filed its opposition but before Mr. Vargas replied, the Second Circuit decided *United States v. Brooker*, which held that a district court may consider any potentially extraordinary and compelling reasons proffered by a defendant in support of his motion for compassionate release.  976 F.3d 228, 237 (2d Cir. 2020).  In writing to update the Court of the *Brooker* decision, the Government offered no new bases for opposing Defendant's motion, instead relying on its initial brief. *See* Gov't Ltr., Dkt. 145.

## DISCUSSION

### I.      Compassionate Release Standard

Pursuant to 18 U.S.C. § 3582(c)(1)(A), a court is authorized to modify a previously imposed term of imprisonment in only very limited circumstances.  From its original enactment in 1984 until 2018, this provision provided BOP with "exclusive power over all avenues of

compassionate release." *Brooker*, 976 F.3d at 231.  As amended by the First Step Act of 2018 ("FSA"), however, § 3582(c)(1)(A) now permits a defendant to bring a motion for compassionate release on his own behalf, after he "has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility."  18 U.S.C. § 3582(c)(1)(A); *United States v. Fisher*, No. 83-CR-150, 2020 WL 5992340, at *3 (S.D.N.Y. Oct. 9, 2020).

Today, assuming the defendant has satisfied the exhaustion requirement, the court "may reduce the term of imprisonment . . . , after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction."  18 U.S.C. § 3582(c)(1)(A).  While § 3582(c)(1)(A) also requires that any sentence reduction be "consistent with applicable policy statements issued by the Sentencing Commission," the Second Circuit recently held that the FSA rendered U.S. Sentencing Guidelines Manual § 1B1.13 Application Note 1(D) inapplicable to compassionate release motions brought directly by a defendant.  *See Brooker*, 976 F.3d at 230.  As a further byproduct of *Brooker*, a court evaluating a motion for compassionate release brought by a defendant need not consider BOP's guidance concerning what constitutes an extraordinary and compelling reason under § 3582(c)(1)(A).  *See id.* at 238 n.5.  The bottom line, therefore, is that the district court has broad discretion in evaluating a defendant's motion for compassionate release; "[t]he amendment of the compassionate release statute by the FSA 'freed district courts to consider the full slate of extraordinary and compelling reasons that an imprisoned person might bring before them' when seeking a sentence reduction."  *Fisher*, 2020 WL 5992340, at *3 (quoting *Brooker*, 976 F.3d at 237).

## II.        Extraordinary and Compelling Reasons

Mr. Vargas contends that his lengthy sentence imposed under a now-unconstitutional sentencing regime, his age and health considered in connection with the ongoing COVID-19 pandemic, his interest in caring for his ill, elderly mother, and his demonstrable rehabilitation together amount to extraordinary and compelling reasons warranting compassionate release. Outside of arguing that Mr. Vargas's health issues are not nearly as serious as he makes them out to be, the Government opposes the motion based almost entirely on technical arguments concerning the factors that BOP deems to constitute extraordinary and compelling reasons.  But the Government proffered its initial opposition in a pre-*Brooker* world.  Evaluating the instant motion post-*Brooker*, this Court is not bound by BOP's determination of what constitutes extraordinary or compelling circumstances; instead, this Court can exercise its broad discretion to consider any factor or collection of factors it deems relevant.  Despite having had the opportunity to do so, the Government did not supplement its initial brief with additional arguments in opposition to Mr. Vargas's motion.  The Court, therefore, infers that the Government does not dispute Mr. Vargas's arguments concerning the draconian nature of his sentence, his ailing mother, or his rehabilitation.

### A.  Vargas's Original Sentence

In October 1991, Mr. Vargas was sentenced to 40 years for his participation in a narcotics conspiracy.  His lengthy sentence was the product of the then-mandatory Sentencing Guidelines, pursuant to which Judge Edelstein concluded that Mr. Vargas qualified as a career offender.  In the intervening years, however, following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the sentencing landscape has changed dramatically; a defendant

similarly situated to Mr. Vargas would be very unlikely to be sentenced in the Southern District

of New York to anything approaching 40 years.[2]

---

[2]      Mr. Vargas argues that he was found to be a career offender in part pursuant to the residual clause of the Sentencing Guidelines.  *See* Def. Mot. at 1, 3–6, 13–14.  While the Supreme Court in *Johnson* struck down as unconstitutionally vague the identically worded sentence-enhancing residual clause of the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), *see Johnson*, 135 S. Ct. at 2564, subsequent case law has hindered defendants who are serving sentences imposed under mandatory Sentencing Guidelines from successfully challenging their sentences based on the argument that the residual clause in the career offender Guideline is unconstitutional.  *See Beckles v. United States*, 137 S. Ct. 886, 890 (2017) (holding that the advisory Guidelines are not subject to vagueness challenges under the Fifth Amendment's Due Process Clause); *Nunez v. United States*, 954 F.3d 465, 467 (2d Cir. 2020) (limiting *Johnson*'s holding to sentences imposed under the residual clause of the ACCA).

        Whether Mr. Vargas was even sentenced under the residual clause of the Guidelines, however, is not entirely clear.  Judge Edelstein concluded that Mr. Vargas was a career offender because he was older than 18, was convicted of a controlled substance violation, and had at least two prior felony convictions for either crimes of violence or controlled substance offenses.  *See* U.S.S.G. § 4B1.1.  According to his PSR, Mr. Vargas had three prior convictions at the time of his arrest for the instant narcotics conspiracy: (1) a New York state conviction for Criminal Sale of a Controlled Substance in the Third Degree; (2) a New York state conviction for Criminal Possession of a Narcotic Drug in the Fourth Degree; and (3) a New York state conviction for Manslaughter in the First Degree.  PSR ¶¶ 28–34.  While the Probation Department and Judge Edelstein both relied on Mr. Vargas's manslaughter conviction, which Probation considered to be a crime of violence, to classify him as a career offender, Mr. Vargas's two narcotics offenses would seemingly classify him as a career offender, even without considering the manslaughter conviction.  Thus, even if *United States v. Scott*, 954 F.3d 74 (2d Cir. 2020), is upheld on rehearing so that first-degree manslaughter under New York law is not a "crime of violence" as that term is used in the Guidelines, the Court would not need to revert to the residual clause to conclude that Mr. Vargas was a career offender at the time of his sentence.

        There are good arguments, however, that one of Mr. Vargas's prior drug convictions would not qualify as a "controlled substance offense" as defined in the Sentencing Guidelines.  Pursuant to the Guidelines, a "controlled substance offense" is "an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense."  U.S.S.G. § 4B1.2.  New York law defines Criminal Possession of a Narcotic Drug in the Fourth Degree as "knowingly and unlawfully possess[ing]" certain substances in a specific quantity.  *See* N.Y. Penal Law § 220.09.  Only one of the 15 articulated bases under which a defendant may be liable includes as an element that the defendant possessed the substance with an intent to sell; all other 14 subsections impose liability for possession alone.  *See id.*  Given the lack of information concerning Mr. Vargas's conviction for this offense, it is plausible that his conviction was one for simple possession, which cannot be characterized as a "controlled substance offense" under the Guidelines.  *See Romero v. United States*, 933 F. Supp. 2d 528, 532 (S.D.N.Y. 2013) ("[T]o qualify as a predicate offense under the Sentencing Guidelines, a conviction or guilty plea must include both elements of possession and intent to distribute a controlled substance."); *see also United States v. Neal*, 27 F.3d 90, 92–94 (4th Cir. 1994) (finding that convictions under provisions of New York Penal Law § 220.06 which do not contain express language regarding an intent to sell cannot be considered "controlled substance offenses" for career offender determinations).

        To the extent Mr. Vargas's manslaughter conviction is necessary for his classification as a career offender and if the Second Circuit upholds the decision in *Scott* holding that first-degree manslaughter under New York law is not a crime of violence, Mr. Vargas has provided an additional reason supporting his motion for compassionate release.  In any event, this Court does not consider the residual clause issue essential to its determination that Mr. Vargas's sentence is unduly harsh under modern standards and is sufficient, in conjunction with his other circumstances, to constitute extraordinary and compelling reasons warranting early release.

In *Booker*, the Supreme Court held that the Sentencing Guidelines cannot be mandatory, thus requiring courts to consider the Guidelines as advisory only.  *Booker*, 543 U.S. at 245. Unfortunately for Mr. Vargas and others in his position, the Second Circuit determined that those who had previously received mandatory Guideline sentences could not rely on *Booker* to retroactively challenge their sentences.  *See Guzman v. United States*, 404 F.3d 139, 140 (2d Cir. 2005).

Thus, assessing Mr. Vargas's sentence in light of current law, it is difficult to escape the conclusion that it is both "[d]raconian" and "exceptionally harsh."  *See* Def. Mot. at 1, 19.  Under today's sentencing scheme, it is highly unlikely that Mr. Vargas would have been sentenced to 480 months in prison for his participation in a narcotics conspiracy, even given his criminal background at the time of the offense conduct.  A significant disparity therefore exists between Mr. Vargas and those sentenced in this district for similar conduct post-*Booker*.

The Government's only response to Mr. Vargas's contention that his harsh sentence — seemingly impervious to challenge despite beneficial intervening case law — should be considered as part of the extraordinary and compelling analysis is that neither the Sentencing Commission's policy statement nor BOP regulations provide any basis for considering the length or severity of a sentence in granting compassionate release.  *See* Gov't Resp. at 4–5.  The Government proffers no argument on the merits of Mr. Vargas's position concerning the harshness of his original sentence.  But as courts have readily found since the Second Circuit's decision in *Brooker*, "the strict approach taken by the Government," which "rigidly appl[ies] the categories" in the Sentencing Commission's policy statement, "cannot prevail."  *Fisher*, 2020 WL 5992340, at *4.

Even before *Brooker*, however, many courts operated under the premise that the FSA authorized consideration of factors beyond BOP's crabbed categories. *See Brooker*, 976 F.3d at 234 (noting that the majority of courts have concluded that the FSA "freed district courts to exercise their discretion in determining what are extraordinary circumstances"). Thus, in light of the FSA, courts have considered the severity or length of a defendant's sentence as part of their evaluation of the presence *vel non* of extraordinary and compelling circumstances. As is relevant here, numerous defendants facing sentences imposed under mandatory Sentencing Guidelines or other since-invalidated laws or practices have been granted compassionate release at least in part based on the perceived unfairness of their original sentences. *See, e.g.*, *United States v. Parker*, 461 F. Supp. 3d 966, 985 (C.D. Cal. 2020) (considering "the severity of [defendant's] life sentence, imposed under a sentencing regime that is no longer valid," as part of the extraordinary and compelling reasons justifying compassionate release); *United States v. Haynes*, 456 F. Supp. 3d 496, 514 (E.D.N.Y. 2020) (deeming the "brutal impact of [defendant's] original sentence" and "its harshness as compared to sentences imposed on similar and even more severe criminal conduct today" to be an extraordinary and compelling reason warranting relief); *United States v. Marks*, 455 F. Supp. 3d 17, 36 (W.D.N.Y. 2020) (holding that, while the retroactivity provisions of the FSA did not apply directly to defendant, the FSA still "evidences Congress's intent to mitigate the harsh and sometimes unjust effects of the sentencing laws"); *United States v. Redd*, 444 F. Supp. 3d 717, 722–24 (E.D. Va. 2020) (finding discrepancy between defendant's 603-month sentence — imposed under mandatory Guidelines and prior practice of "stacking" § 924(c) charges — and modern sentences for same conduct to constitute extraordinary and compelling reason justifying compassionate release); *see also United States v. Curtis*, No. 03-

CR-533, 2020 WL 1935543, at *3 (D.D.C. Apr. 22, 2020) (considering harshness of defendant's sentence in evaluating the § 3553(a) factors).

In the wake of *Brooker*, there can be no doubt that the Court is entitled to consider the severity of Mr. Vargas's sentence in weighing his motion for compassionate release.  In fact, the Second Circuit explicitly mentioned the "injustice of [a defendant's] lengthy sentence" as a factor that a district court might consider in favor of a sentence reduction, as "Congress seemingly contemplated that courts might consider such circumstances when it passed the original compassionate release statute in 1984."  *Brooker*, 976 F.3d at 238 (citing S. Rep. No. 98-225, at 55–56 (1984)); *see also United States v. Maumau*, No. 08-CR-758-TC-11, 2020 WL 806121, at *6–7 (D. Utah Feb. 18, 2020).  In light of the foregoing, the Court is unwilling to ignore the harshness of Mr. Vargas's sentence and the discrepancy between Mr. Vargas and similarly situated defendants who have been sentenced post-*Booker* for similar criminal conduct when deciding his motion for compassionate release.

### B.  Vargas's Health, Age, and the COVID-19 Pandemic

Mr. Vargas also contends that his age and health place him at greater risk of serious illness or death should he contract COVID-19.  Mr. Vargas asserts that he suffers from hypertension and is obese, or at least borderline obese; Mr. Vargas is also blind in one eye.  *See* Def. Mot. at 7, 18; Def. Reply at 11–13; Oct. 22, 2020 Def. Ltr., Dkt. 147.  The Government asserts that medical records do not support Mr. Vargas's health claims, and in any event, mild hypertension and blindness in one eye do not discharge his burden to demonstrate that he suffers from ailments that substantially diminish his ability to provide self-care in a prison setting.  *See* Gov't Resp. at 5–6 (quoting U.S.S.G. § 1B1.13 app. note 1(A); *United States v. Decker*, 17-CR-0738 (LAK), 2020 WL 3268706, at *2 (S.D.N.Y. June 17, 2020)).

Mr. Vargas's most recent medical records provide no data concerning Mr. Vargas's
weight, height, or blood pressure, indicating only that he has been classified as obese at various
points over the past several years, including most recently in 2016.  Records from a health visit
in July 2017 provide the most recent data bearing on Mr. Vargas's claimed hypertension and
obesity.  According to these records, Mr. Vargas's blood pressure in July 2017 was 146/74, he
was 68 inches tall, and he weighed 185 pounds.  *See* BOP Health Servs., Clinical Encounter, July
27, 2016; Def. Reply at 12.  According to the American Heart Association, a systolic blood
pressure reading above 140 places an individual in the Hypertension Stage 2 category.  *See*
*Understanding Blood Pressure Readings*, Am. Heart Ass'n, https://www.heart.org/en/health-
topics/high-blood-pressure/understanding-blood-pressure-readings (last visited Nov. 9, 2020).
The Court therefore credits Mr. Vargas's contention that he has hypertension.  Further, Mr.
Vargas's 2017 height and weight result in a BMI of 28.1, classified as overweight.  *See BMI*
*Calculator*, NIH, https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last
visited Nov. 9, 2020).  Given Mr. Vargas's most recent known BMI of 28.1 and his previous
BMI of 30.1, the Court credits Mr. Vargas's claim that he is overweight and maybe technically
obese.

Absent the ongoing — and currently worsening — pandemic, Mr. Vargas's medical
concerns alone would not warrant compassionate release.  He is able to care for himself in a
prison setting.  Further, while elevating his risk to some extent, at 55 years old, Mr. Vargas's age
does not place him within a particularly susceptible category of individuals.  *See COVID-19:*
*Older Adults*, Ctrs. for Disease Control and Prevention (Sept. 11, 2020),
https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html
(demonstrating increased risk from COVID-19 correlated with older age, but noting that "8 out

of 10 COVID-19-related deaths reported in the United States have been among adults aged 65

years and older"). Nevertheless, Mr. Vargas's hypertension and weight place him in a higher

risk category, were he to contract COVID-19. *See COVID-19: People with Certain Medical*

*Conditions*, Ctrs. for Disease Control and Prevention (Nov. 2, 2020),

https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-

conditions.html (listing obesity as a condition placing adult at "increased risk of severe illness"

from COVID-19 and listing "hypertension" and "overweight" as conditions that might place

adult at increased risk for severe illness from COVID-19).

On many occasions since the onset of the pandemic, courts in this circuit have granted

compassionate release to defendants based on their increased risk of serious illness or death from

COVID-19 due to the comorbidities of hypertension or obesity, either on their own or in

conjunction with other comorbidities. *See, e.g.*, *United States v. Franco*, No. 12-CR-932, 2020

WL 4344834, at *3 (S.D.N.Y. June 24, 2020) (agreeing with other courts in finding that 41-year-

old defendant with hypertension, obesity, and diabetes demonstrated extraordinary and

compelling reasons justifying release during COVID-19 pandemic); *United States v. Salvagno*,

456 F. Supp. 3d 420, 427–28 (N.D.N.Y. 2020) (finding heightened risk of severe illness if

defendant were to contract COVID-19 due to defendant's hypertension constitutes extraordinary

and compelling reason for his release); *United States v. Sawicz*, 453 F. Supp. 3d 601, 605

(E.D.N.Y. 2020) (same); *United States v. Zukerman*, 451 F. Supp. 3d 329, 334–35 (S.D.N.Y.

2020) (granting compassionate release for older defendant with hypertension, obesity, and

diabetes). While Defendant's health issues are less stark than those afflicting defendants who

have been granted compassionate release on the basis of their health concerns alone, here, the

Court need not and does not consider Defendant's medical concerns in isolation, but as one component of the overall analysis.

### C.  Vargas's Mother

In further support of his motion, Mr. Vargas notes his desire to put into practice certain of the skills he has learned while incarcerated by caring for his elderly mother, who suffers from breast cancer, arthritis, diabetes, and a suppressed immune system.  *See* Def. Mot. at 8.  In opposition, the Government contends this is "not a cognizable reason for granting compassionate release" because the Sentencing Commission's guidance permits consideration of family circumstances only where "the defendant is the only available caregiver for a minor child or incapacitated spouse."  Gov't Resp. at 6 (quoting U.S.S.G. § 1B1.13 app. note 1(C)).  As with other of the Government's arguments, however, this is no longer a valid basis upon which to oppose Defendant's motion.  While the Sentencing Commission rigidly limited consideration of family circumstances to cases in which a defendant's minor child or spouse had no other available caregiver, the same policy principles would seemingly support consideration of a defendant's incapacitated parent.  Freed from the unyielding constraints of the Sentencing Commission's guidance, the Court credits Mr. Vargas's wish to assist in the care of his sick mother in its assessment of extraordinary and compelling reasons.[3]

### D.  Vargas's Rehabilitation

Finally, Mr. Vargas asserts that after more than three decades in prison, he has been completely rehabilitated, an additional factor to consider in weighing whether he has established extraordinary and compelling reasons justifying his release.  Having asserted that Mr. Vargas failed to put forth any other legally cognizable or availing bases for compassionate release, the

---

[3]      As with Mr. Vargas's health, his mother's health, standing alone, would not likely warrant granting Mr. Vargas compassionate release.

Government contends only that rehabilitation alone cannot constitute an extraordinary and compelling reason warranting a sentence reduction.  *See* Gov't Resp. at 6–7.  In this instance, the Court is not free to disregard the Government's argument, for there remains a statutory command that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."  28 U.S.C. § 994(t); *see also Brooker*, 976 F.3d at 237–38.  But there can be no reasonable contention that by considering Mr. Vargas's rehabilitation the Court would be doing so in isolation, considering the exercise of its discretion to consider factors such as Mr. Vargas's severe sentence, his health amid an ongoing pandemic, and his mother's deteriorating health.

There is ample precedent for courts to consider a defendant's rehabilitation as one of multiple factors warranting compassionate release, and here, where the Defendant's rehabilitation appears to be dramatic, the Court would be remiss to ignore it entirely.  *See, e.g.*, *United States v. Phillips*, No. 94-Cr-631, 2020 WL 4742908, at *3–4 (S.D.N.Y. June 30, 2020) ("[R]ehabilitation remains 'relevant to whether there are extraordinary and compelling reasons for a sentence reduction.'" (quoting *United States v. Torres*, No. 87-Cr-593, 2020 WL 2815003, at *9 (S.D.N.Y. June 1, 2020)); *Marks*, 455 F. Supp. 3d at 25–26 (collecting cases finding that combination of changes to outdated and unjust practice of "stacking" sentences coupled with defendant's rehabilitation establishes extraordinary and compelling reasons justifying compassionate release); *United States v. Millan*, No. 91-CR-685, 2020 WL 1674058, at *7 (S.D.N.Y. Apr. 6, 2020) (finding that Congress believed "rehabilitation is relevant to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute 'extraordinary and compelling reasons' for a sentence reduction").  In *Brooker*, the Second Circuit affirmed that rehabilitation, especially

considered in conjunction with the COVID-19 pandemic and the "injustice" of a lengthy sentence, can "weigh in favor of a sentence reduction." *Brooker*, 976 F.3d at 238; *see also United States v. Rodriguez*, No. 00-Cr-761-2, 2020 WL 5810161, at *4 (S.D.N.Y. Sept. 30, 2020) (granting compassionate release due to complete rehabilitation, medical issues, and COVID-19 pandemic).

The first decade or so of Mr. Vargas's term of incarceration evidences a man who struggled to break from his past habits of drug use and violent behavior.  Throughout his twenties and into his early thirties, Mr. Vargas continued to accrue disciplinary infractions, primarily for drug offenses but also for assault and possession of dangerous weapons.  *See* Disc. Record at 2–6.  Since 2004, however, Mr. Vargas has largely managed to avoid any trouble and appears to have kicked his drug habit, with only three infractions in the past 16 years, and none since 2015.  *See id.* at 1–2.  Mr. Vargas has also obtained his GED and completed a significant number of other educational programs and courses.  *See* Educ. Record.

Most importantly, those responsible for evaluating Mr. Vargas have determined that he has been rehabilitated and transformed himself into "an asset to the community."  Dkt. 142-2.  In the words of his Correctional Counselor, Mr. Vargas "goes above and beyond to self-rehabilitate," and his incarceration "has humbled him and rehabilitated him."  *Id.*  Considering Mr. Vargas's rehabilitation in conjunction with his unduly harsh sentence, his medical issues and heightened risk of severe illness or death due to the COVID-19 pandemic, and his intention to care for his ailing, elderly mother, the Court finds that Mr. Vargas has demonstrated extraordinary and compelling reasons justifying a sentence reduction.

### III.    Section 3553(a) Factors

Section 3553(a) requires that the court "'impose a sentence sufficient, but not greater than necessary,' . . . to facilitate retribution, deterrence, incapacitation, and rehabilitation." *Phillips*, 2020 WL 4742908, at *2 (quoting 18 U.S.C. § 3553(a)).  The Government failed to address the § 3553(a) factors in its opposition to Mr. Vargas's motion; nevertheless, the Court must consider whether, extraordinary and compelling circumstances notwithstanding, reducing Mr. Vargas's sentence is appropriate considering the aims of § 3553(a).  In looking at the § 3553(a) factors, the Court finds that reducing Mr. Vargas's sentence is consistent with the goals of sentencing and does not second-guess or relitigate Judge Edelstein's original judgment.  *See United States v. Ebbers*, 432 F. Supp. 3d 421, 429 (S.D.N.Y. 2020) (explaining that compassionate release is "not an opportunity to second guess or to reconsider whether the original sentence was just").

In looking to factors such as "the nature and circumstances of the offense," the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense," and the need for the sentence "to afford adequate deterrence to criminal conduct," the Court finds that the balance tilts heavily in favor of Mr. Vargas.  18 U.S.C. § 3553(a)(1), (2)(A)–(B).  At the outset, the Court notes that Mr. Vargas is scheduled to be released on June 3, 2023.  With good time credits, Mr. Vargas has thus served all but 31 months of his 480-month sentence; in other words, Mr. Vargas has served approximately 93% of his sentence.  There is little reason to believe that any additional period of incarceration will serve the goals of either specific or general deterrence or will otherwise promote the goals of sentencing.

Further, as the Court has previously pointed out, a 32-year sentence for participation in a narcotics conspiracy is undoubtedly a more severe sentence than defendants in similar

circumstances in this district would face if sentenced today.  While Mr. Vargas's participation in

a conspiracy to sell substantial quantities of heroin on the streets of New York City was

undoubtedly a serious offense, he was neither the ringleader of the operation nor a kingpin in the

organization with which he was affiliated.  A 32-year period of incarceration followed by five

years of supervised release more than adequately reflects the seriousness of the offense,

promotes respect for the law, and provides just punishment for Mr. Vargas's conduct.  This

conclusion also implicates another of the § 3553(a) factors: "the need to avoid unwarranted

sentence disparities among defendants with similar records who have been found guilty of

similar conduct."  18 U.S.C. § 3553(a)(6).  Reducing Mr. Vargas's sentence by approximately 30

months brings him closer in line with similarly situated defendants.

In considering the history and characteristics of the Defendant, Mr. Vargas's health

concerns and his rehabilitation both weigh in his favor.  As this Court and others have found,

"the 'history and characteristics of the defendant' and the 'need . . . to provide the defendant with

needed . . . medical care,' § 3553(a), are factors that can support a sentence reduction during

pandemic conditions when the defendant is particularly susceptible to illness."  *United States v.*

*Rodriguez*, No. 17-CR-157, 2020 WL 3051443, at *3 (S.D.N.Y. June 8, 2020) (quoting *United*

*States v. Pena*, 459 F. Supp. 3d 544, 550 (S.D.N.Y. 2020)).  Further, as the Supreme Court has

held, "evidence of postsentencing rehabilitation may be highly relevant to several of the

§ 3553(a) factors that Congress has expressly instructed district courts to consider at sentencing."

*Pepper v. United States*, 562 U.S. 476, 491 (2011).  As discussed, Mr. Vargas, especially over

the course of the past decade, has demonstrated his rehabilitation and readiness to re-enter

society.

The last factor the Court must consider is the need "to protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(C).  Before *Brooker*, in abiding by the Sentencing Commission's relevant policy statement, the Court was also required to consider whether the defendant was "a danger to the safety of any other person or to the community." U.S.S.G. § 1B1.13.  The Court considers these as largely synonymous and therefore weighs both Mr. Vargas's recidivism risk and potential threat to the community at large.  As the Government notes in opposing his motion, Mr. Vargas has a significant and disturbing history of violent criminal behavior.  *See* Gov't Resp. at 6.  Mr. Vargas was convicted of manslaughter at 18 years old after he fatally stabbed another drug dealer with a knife.  *See* PSR ¶¶ 34–36.  Further, in the first several years of his term of incarceration, Mr. Vargas incurred disciplinary infractions for assault with serious injury and threatening bodily harm.  *See* Disc. Record at 5–6.

Because of the seriousness of Mr. Vargas's past conduct, his rehabilitation is critical to the Court's finding that Mr. Vargas likely does not pose a danger to the public.  As the Court has stressed, Mr. Vargas appears to have turned his life around within the past 16 years, during which he has seemingly cut drugs entirely out of his life and refrained from engaging in violent behavior.  Outside of an infraction for "disruptive conduct" in 2015, which Mr. Vargas contests, Mr. Vargas's last disciplinary infraction involving potentially dangerous behavior came in 2004 for possession of a dangerous weapon.  *See* Disc. Record at 1, 2.  Mr. Vargas's Correctional Counselor, who has worked with him for the past four years, articulates no basis for believing that Mr. Vargas would return to a criminal lifestyle or endanger the community upon release, instead describing a religious, respectful, and rehabilitated man.  *See* Dkt. 142-2.  Mr. Vargas is also now 55 years old.  His age and the duration of time he has been removed from his criminal lifestyle further support the conclusion that recidivism is unlikely.  *See Fisher*, 2020 WL

5992340, at *7 ("[Defendant's] age and time removed from criminal activity, along with his clean disciplinary record, lessen the need for further specific deterrence or to 'protect the public from further crimes of the defendant.'" (quoting 18 U.S.C. § 3553(a)(2)(B)–(C)); *Rodriguez*, 2020 WL 5810161, at *6 (finding release at the age of 60 makes "the likelihood of re-offending even more remote"); *United States v. Rice*, No. 83-CR-150-3, 2020 WL 4505813, at *4 (S.D.N.Y. Aug. 5, 2020) ("[G]iven Defendant's advanced age and serious health problems, he is significantly less likely to recidivate.").  Finally, Mr. Vargas's impending five-year term of supervised release will adequately ensure his continued good behavior and abstention from violent or criminal conduct.

## CONCLUSION

For the foregoing reasons, Mr. Vargas's motion for compassionate release is GRANTED. Mr. Vargas's term of incarceration is reduced to time served plus not more than 14 days during which the Court understands he will be quarantined and tested for COVID-19.  The Court further directs the Probation Office to use those 14 days to ensure there is an adequate and appropriate re-entry plan for Mr. Vargas.  Mr. Vargas's original five-year term of supervised release will begin upon his release from imprisonment. All other aspects of the sentence, including all other conditions of supervision, remain unchanged and in effect.  The Government and USP Atlanta are directed to release Mr. Vargas immediately upon the conclusion of his 14-day quarantine period or at an earlier time if he has tested negative for COVID-19.

The Clerk of Court is respectfully directed to terminate the open motion at Dkt. 142.

**SO ORDERED.**

**Dated: November 24, 2020**
**New York, NY**

**VALERIE CAPRONI**
**United States District Judge**